IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

SHAWN EDWARD BOATWRIGHT,                    Civil No. 3:14-cv-01658-PK

        Plaintiff,

                                                   OPINION AND ORDER

v.

CAROLYN W. COLVIN,
Commissioner of Social Security,

        Defendant.
_____

PAPAK, Magistrate Judge:

        Plaintiff Shawn Edward Boatwright  filed this action May 27, 2011, seeking judicial

review of the Commissioner of Social Security's final decision denying his applications for

Disability Insurance benefits under Title II and Supplemental Security Income under Title XVI of

the Social Security Act.   This court has jurisdiction over plaintiff's action pursuant to 42 U.S.C.

§ 405(g) and 1383(c)(3).

Page 1 - OPINION AND ORDER

Boatwright argues  that by  erroneously rejecting his testimony regarding the extent of his impairments, and failing to give proper weight to lay witness evidence, the Commissioner failed properly to assess his residual functional capacity after completing step three of the five-step sequential process for analyzing a Social Security claimant's entitlement to benefits, and for that reason erred by finding Boatwright capable of performing work at step five of the process.

I have considered all of the parties' briefs and all of the evidence in the administrative record.  For the reasons set forth below, the Commissioner's decision is reversed and this matter is remanded pursuant to sentence four of 42 U.S.C. § 405(g) for further administrative proceedings consistent with this Opinion and Order.

## DISABILITY ANALYSIS FRAMEWORK

To establish disability within the meaning of the Act, a claimant must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected . . . to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).  The Commissioner has established a five-step sequential process for determining whether a claimant has made the requisite demonstration. *See Bowen v. Yuckert*, 482 U.S. 137, 140 (1987); *see also* 20 C.F.R. § 404.1520(a)(4).  At the first four steps of the process, the burden of proof is on the claimant; only at the fifth and final step does the burden of proof shift to the Commissioner. *See Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999).

At the first step, the Administrative Law Judge ("ALJ") considers the claimant's work activity, if any. *See Bowen*, 482 U.S. at 140; *see also* 20 C.F.R. § 404.1520(a)(4)(i).  If the ALJ finds that the claimant is engaged in substantial gainful activity, the claimant will be found not

disabled. *See Bowen*, 482 U.S. at 140; *see also* 20 C.F.R. §§ 404.1520(a)(4)(i), 404.1520(b).

Otherwise, the evaluation will proceed to the second step.

At the second step, the ALJ considers the medical severity of the claimant's impairments.

*See Bowen*, 482 U.S. at 140-141; *see also* 20 C.F.R. § 404.1520(a)(4)(ii).  An impairment is

"severe" if it significantly limits the claimant's ability to perform basic work activities and is

expected to persist for a period of twelve months or longer.  *See Bowen*, 482 U.S. at 141; *see also*

20 C.F.R. § 404.1520(c).  The ability to perform basic work activities is defined as "the abilities

and aptitudes necessary to do most jobs." 20 C.F.R. § 404.1521(b); *see also Bowen*, 482 U.S. at

141.  If the ALJ finds that the claimant's impairments are not severe or do not meet the duration

requirement, the claimant will be found not disabled.  *See Bowen*, 482 U.S. at 141; *see also* 20

C.F.R. §§ 404.1520(a)(4)(ii), 404.1520(c).  Nevertheless, it is well established that "the step-two

inquiry is a de minimis screening device to dispose of groundless claims." *Smolen v. Chater*, 80

F.3d 1273, 1290 (9th Cir. 1996), *citing Bowen*, 482 U.S. at 153-154.  "An impairment or

combination of impairments can be found 'not severe' only if the evidence establishes a slight

abnormality that has 'no more than a minimal effect on an individual[']s ability to work." *Id.*,

*quoting* S.S.R. 85-28, 1985 SSR LEXIS 19 (1985).

If the claimant's impairments are severe, the evaluation will proceed to the third step, at

which the ALJ determines whether the claimant's impairments meet or equal "one of a number of

listed impairments that the [Commissioner] acknowledges are so severe as to preclude

substantial gainful activity." *Bowen*, 482 U.S. at 141; *see also* 20 C.F.R. §§ 404.1520(a)(4)(iii),

404.1520(d).  If the claimant's impairments are equivalent to one of the impairments enumerated

in 20 C.F.R. § 404, subpt. P, app. 1, the claimant will conclusively be found disabled. *See Bowen*, 482 U.S. at 141; *see also* 20 C.F.R. §§ 404.1520(a)(4)(iii), 404.1520(d).

If the claimant's impairments are not equivalent to one of the enumerated impairments, between the third and the fourth steps the ALJ is required to assess the claimant's residual functional capacity ("RFC"), based on all the relevant medical and other evidence in the claimant's case record. *See* 20 C.F.R. § 404.1520(e). The RFC is an estimate of the claimant's capacity to perform sustained, work-related physical and/or mental activities on a regular and continuing basis,[1] despite the limitations imposed by the claimant's impairments. *See* 20 C.F.R. § 404.1545(a); *see also* S.S.R. No. 96-8p, 1996 SSR LEXIS 5 (July 2, 1996).

At the fourth step of the evaluation process, the ALJ considers the RFC in relation to the claimant's past relevant work. *See Bowen*, 482 U.S. at 141; *see also* 20 C.F.R. § 416.920(a)(4)(iv). If, in light of the claimant's RFC, the ALJ determines that the claimant can still perform his or her past relevant work, the claimant will be found not disabled. *See Bowen*, 482 U.S. at 141; *see also* 20 C.F.R. §§ 404.1520(a)(4)(iv), 404.1520(a)(4)(iv), 404.1520(f). In the event the claimant is no longer capable of performing his or her past relevant work, the evaluation will proceed to the fifth and final step, at which the burden of proof shifts, for the first time, to the Commissioner.

At the fifth step of the evaluation process, the ALJ considers the RFC in relation to the claimant's age, education, and work experience to determine whether a person with those characteristics and RFC could perform any jobs that exist in significant numbers in the national

---

[1] "A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule." S.S.R. No. 96-8p, 1996 SSR LEXIS 5 (July 2, 1996).

economy. *See Bowen*, 482 U.S. at 142; *see also* 20 C.F.R. §§ 404.1520(a)(4)(v), 404.1520(g),
404.1560(c), 404.1566. If the Commissioner meets her burden to demonstrate the existence in
significant numbers in the national economy of jobs capable of being performed by a person with
the RFC assessed by the ALJ between the third and fourth steps of the five-step process, the
claimant is found not to be disabled. *See Bowen*, 482 U.S. at 142; *see also* 20 C.F.R. §§
404.1520(a)(4)(v), 404,1520(g), 404.1560(c), 404.1566. A claimant will be found entitled to
benefits if the Commissioner fails to meet that burden at the fifth step. *See Bowen*, 482 U.S. at
142; *see also* 20 C.F.R. §§ 404.1520(a)(4)(v), 404.1520(g).

## LEGAL STANDARD

A reviewing court must affirm an Administrative Law Judge's decision if the ALJ applied
proper legal standards and his or her findings are supported by substantial evidence in the record.
*See* 42 U.S.C. § 405(g); *see also Batson v. Comm'r of Soc. Sec. Admin.*, 359 F.3d 1190, 1193
(9th Cir. 2004). "'Substantial evidence' means more than a mere scintilla, but less than a
preponderance; it is such relevant evidence as a reasonable person might accept as adequate to
support a conclusion." *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035 (9th Cir. 2007), *citing
Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 882 (9th Cir. 2006).

The court must review the record as a whole, "weighing both the evidence that supports
and the evidence that detracts from the Commissioner's conclusion." *Id., quoting Reddick v.
Chater*, 157 F.3d 715, 720 (9th Cir. 1998). The court may not substitute its judgment for that of
the Commissioner. *See id., citing Robbins*, 466 F.3d at 882; *see also Edlund v. Massanari*, 253
F.3d 1152, 1156 (9th Cir. 2001). Moreover, the court may not rely upon its own independent
findings of fact in determining whether the ALJ's findings are supported by substantial evidence

Page 5 - OPINION AND ORDER

of record. *See Connett v. Barnhart*, 340 F.3d 871, 874 (9th Cir. 2003), *citing SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947). If the ALJ's interpretation of the evidence is rational, it is immaterial that the evidence may be "susceptible [of] more than one rational interpretation." *Magallanes v. Bowen*, 881 F.2d 747, 750 (9th Cir. 1989), *citing Gallant v. Heckler*, 753 F.2d 1450, 1453 (9th Cir. 1984).

## SUMMARY OF ADMINISTRATIVE RECORD[2]

Boatwright was 39 years old on his alleged onset date of May 9, 2011. Tr. 138.[3] He completed three years of college. Tr. 168. According to the evidence of record, prior to his claimed disability onset date Boatwright had substantial gainful activity as a rental clerk, a teacher's assistant, a cable technician, an institution attendant, an installer, and a meat boner. Tr. 62-63, 209. He stopped working in May 2011. Tr. 167. Boatwright alleges he cannot work due to "decreased vision, headaches, diabetes, chronic headaches, decreased vision in left eye, diabetes, high blood pressure, high cholesterol, short-term memory loss, poor judgment or decision making, emotional outbursts, learning problems, depression." Tr. 167.

## I. The Medical Record

## A. Pre Onset Date of Disability

On March 8, 2010, Boatwright was seen in the emergency room for low back pain. Tr. 333-37. In March and April 2010, Boatwright had a series of physical therapy appointments for low back pain. Tr. 316-32.

---

[2] The following recitation constitutes a summary of the evidence contained within the Administrative Record, and does not reflect any independent finding of fact by the court.

[3] Citations to "Tr." refer to the page(s) indicated in the official transcript of the administrative record filed herein as Docket No. 14.

On August 20, 2010, Boatwright was seen in the emergency room having hit his head in the swimming pool a day earlier. Tr. 304-09. A CT scan of the head showed no fracture. Tr. 348. On August 30, treating physician Royal B. Whinery, M.D., noted dull headache, positional vertigo, decreased concentration, anxiety, high irritability and personality changes. Tr. 482. Dr. Whinery diagnosed severe postconcussive syndrome, and referred Boatwright to a neurologist. Tr. 483.

On October 12, 2010, neurologist Brent N. Hisey, M.D., examined Boatwright. Tr. 247-48. Boatwright reported headaches, dizziness, forgetfulness, emotional lability, and decreased visual acuity since he hit his head in the swimming pool. Tr. 247. Boatwright reported he suffered about ten concussions while playing college football. *Id.* A CT brain scan was within normal limits. Dr. Hisey said "I suspect this is a post-concussion syndrome. I suspect there is also some component of depression." *Id.* Dr. Hisey prescribed fioricet for headaches. Tr. 248.

An October 2010 brain MRI showed that "moderate cerebral cortical atrophy in the frontal lobes towards the vertex of the skull is greater than anticipated for this patient's age." Tr. 259.

On October 26, November 11, and December 1, 2010, Boatwright was seen in the emergency room for postconcussive syndrome and received injections of morphine. Tr. 290-93, 286-89, 298-303.

A December 29, 2010, a Neuropsychological Evaluation Report was prepared by Mickey Ozolins, Ph.D, and Delmar Ozolins, Ph.D. Tr. 260-65. Boatwright reported he hit his head on the bottom of a swimming pool in August and when his wife helped him out of the pool he could not count her fingers and had trouble walking. He was agitated and had a headache. Tr. 260. The following day he went to the emergency room, where a CAT scan was negative and he was

diagnosed with a concussion.  Since then, Boatwright episodically sees stars and is "over reactive

to small things."  *Id.*  Boatwright reported he was moody, with low frustration tolerance, and

inability to control his temper.  His wife reported his left pupil contracts and expands at times,

with subjective associated blurred vision.  Boatwright had short term memory loss.  He worked

full-time supervising juvenile delinquents in a detention center.  Tr. 261.  He was taking

Ibuprofen and Fioricet every eight hours, and Lisinopril, and received morphine with Phenergan

injections every three weeks.  *Id.*

Doctors Ozolins noted good motivation and consistent effort.  Boatwright was

tested in two sessions, five weeks apart, and was emotionally more stable in the second session.

Tr. 262.  Fine motor dexterity was in the Borderline range bilaterally.  Tr. 263.  His Verbal IQ

was at the third percent, and Performance IQ was at the 53rd percent.  *Id.*  His Full Scale IQ was

at the 14th percentile, in the Mildly Impaired range.  "This performance is highly suggestive of a

long standing developmental learning disability, but is not consistent with that typically seen in

head injury."  *Id.*  Boatwright read at the fourth grade level, or moderately impaired, spelled at a

second grade level, or severely impaired, and had a borderline score in arithmetic.  The doctors

concluded:

> The patient endorsed only minimal depression and mild anxiety.
> However, on the MMPI, taken five weeks before he took the Beck
> Inventories, his profile suggested symptom exaggeration, particularly
> somatic symptoms.  This pattern suggests that over time the patient
> has probably shown some improvements and that initially he was
> much more focused on the somatic complaints that included
> neurologic symptoms, head complaints, GI complaints and malaise.
> He continues, according to the MMPI, as well as his self report in
> the interview, however, to experience problems with memory and
> concentration, self doubt and anger and aberrant thoughts and
> perceptions.  He may have a long standing tendency to respond to

> stress by having difficulty with concentration. According to the
> patient's wife, however, even though he previously tended to anger
> before, he was never like this. His MMPI profile also suggests a long
> standing pattern of being prone to temper tantrums, holding grudges
> and to have a low frustration tolerance. Interpersonally, he may feel
> hostile toward others and to distrust others, being cynical and
> believing people are out for their own interests. He may also have a
> long standing tendency toward anxiety.

Tr. 264-65.

On January 25, 2011, Douglas W. Kaplan, M.D., examined Boatwright in a neurological consultation. Tr. 269-71. Boatwright reported a constant headache since his August 19, 2010, swimming pool accident. He had nausea and photophobia, and episodes of blurry vision in his left eye and recurrent dizziness. He reported irritability and left hand numbness. Dr. Kaplan diagnosed chronic postconcussion syndrome and prescribed Lexapro. Tr. 271. In February 2011 Boatwright was diagnosed with Anterior Ischemic Optic Neuropathy, with visual field defects and trauma to the occipital socket. Tr. 375, 377. He reported he lost vision in the left eye for periods of time. Tr. 380.

Dr. Kaplan saw Boatwright again on February 14, when he continued to have daily headaches. Tr. 268. Neurontin was prescribed. *Id.* By mid March, headaches were reduced to three to four times per week. Tr. 267. Neurontin was increased.

On May 4, 2011, Dr. Kaplan noted three to four headaches per week. Tr. 266. Boatwright reported some relief with Anaprox, but continued to have short term memory loss with symptoms of depression and irritability. He was taking Lexapro and Neurontin. *Id.* Dr. Kaplan diagnosed chronic postconcussion syndrome and referred him to a psychiatrist.

A May 4, 2011, brain MRI was essentially normal, but showed mild to moderate parenchymal volume loss which "could be related to multiple prior concussive events...." Tr. 272. A May 18 MRA of the brain was normal. Tr. 346.

Boatwright alleges the onset of disability as of May 9, 2011.

**B. Post Onset Date of Disability**

On May 11, 2011, Boatwright was seen in the emergency room with dizziness, chest pain, and headache. Tr. 273-85. On May 26, Boatwright saw Dr. Whinery to follow up on increased blood pressure. Tr. 480. Dr. Whinery noted emotional lability.

On June 22, 2011, Boatwright began treatment with Leland W. Dennis, M.D., of Rivers Edge Mental Health. Tr. 497-514. Boatwright reported anger outbursts two to three times a week lasting from a few hours to several days. Tr. 497. Boatwright's mood was labile, his insight and judgment impaired. Tr. 499. Dr. Dennis noted symptoms of dementia. *Id.*

On July 5, 2011, Dr. Dennis noted labile mood, physical aggression, and perceptual disturbance. Tr. 495. He prescribed Aricpet. The next day Boatwright's wife left a message with Dr. Dennis, stating Boatwright had argued with his eight year old child, and locked the child out of the home. Tr. 492. Mrs. Boatwright went home, removed the children from the home, and returned later to take Boatwright to get lab work done. They stopped in a park to talk, Boatwright became angry, jumped on the hood of the car, and asked his wife to run him over.

Later that day Boatwright was brought by police to the emergency room where he was evaluated by Dukheh Ahn, M.D., a psychiatrist, after taking his shotgun to the backyard and contemplating suicide. Tr. 414. Boatwright was depressed, anxious, and sad with poor judgment. Tr. 415. Boatwright was taking Lisinopril, Nuedextra, Neurontin, Metform,

Imiprazole, and Doxycycline. Tr. 417. Boatwright was placed in a mental health stabilization

unit and released on July 11. Tr. 420-21. Clinicians noted Boatwright had regressed to about age

ten since the accident with severe anger issues and no impulse control. *Id.* He was assessed a

GAF of 35. [4]  Dr. Dennis recorded, on July 19, that Boatwright's wife no longer left him alone

with the children. Tr. 490.

On July 20, 2011, Savannah Burghardt, M.S., examined Boatwright for Red Rock

Behavioral Health Services. Tr. 437-38. Ms. Burghardt noted Boatwright felt unwanted

because he was not working, he was depressed and hopeless with anger outbursts four to five

times per week. She noted Boatwright "has regressed to about age 10 since accident; he has

severe anger problems; Dr. felt he is high risk of harm to self and others at this point." Tr. 437.

She assessed a GAF of 39. Tr. 427, 437. Boatwright did not drive because of peripheral vision

issues.

On July 29, 2011, Walter W. Bell, M.D., reviewed Boatwright's medical records,

completed a Physical Residual Functional Capacity Assessment, and concluded he was not

disabled. Tr. 401-08.

---

[4] The GAF scale is a tool for "reporting the clinician's judgment of the individual's overall level of functioning." American Psychiatric Ass'n., Diagnostic and Statistical Manual of Mental Disorders 32 (4th ed. 2000)). It is essentially a scale of zero to 100 in which the clinician considers "psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness," not including impairments in functioning due to physical or environmental limitations. *Id* at 34. A Global Assessment of Functioning ("GAF") score between 31 and 40 indicates "Some impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) or major impairment in several areas, such as work or school, family relations, judgement, thinking, or mood (e.g. depressed man avoids friends, neglects family, and is unable to work....)" *Id* at 34.

On August 17, Dr. Whinery examined Boatwright for complaints of headaches, shortness of breath, and fatigue. Tr. 478. On August 18, Dukheh Ahn, M.D., at Red Rock Behavioral Health, recorded a constricted affect and anxious mood. Tr. 547.

The next day Richard D. Kahoe, Ph.D., conducted a mental status examination of Boatwright at the request of the SSA. Tr. 444-48. Dr. Kahoe described Boatwright as obese, tense, apprehensive, worried and uneasy. Tr. 444. His mood was depressed, with markedly variable appetite, sleep disturbance, and fatigue. Dr. Kahoe found Boatwright's attention and concentrations skills were mildly impaired, with deficits in short term memory. Tr. 445. Dr. Kahoe diagnosed dementia due to traumatic head injury with behavioral disturbance, adjustment disorder with depressed mood and irritability, and assessed a GAF of 52. Tr. 448. Dr. Kahoe opined that Boatwright was "marginally" able to manage benefit payments. Tr. 443.

On September 13, 2011, Dr. Dennis noted Boatwright had headaches and dizziness, and had fallen down the previous day. Tr. 488. His GAF was assessed as 55. *Id.* Two days later, Dr. Whinery saw Boatwright for headache and loss of balance, and he received an injection for temporal pain. Tr. 476, 475. Boatwright requested a work release, but admitted he would not be able to complete tasks. *Id.* Boatwright also saw Dr. Dennis, and reported he was getting a divorce, and was sleeping better. Tr. 489. The same day, Boatwright saw Dr. Ahn who recorded an unkept appearance, with a constricted affect and anxious mood. Tr. 545.

On October 7, 2011, Dr. Whinery completed a Statement for Long Term Disability Benefits for Standard Insurance Company in which he stated Boatwright could not work, was unable to sustain concentration or perform adequate reasoning, and had short term memory loss.

Tr. 589. Dr. Whinery opined that Boatwright was unable to manage insurance benefits and anticipated no change in Boatwright's condition. *Id.*

Boatwright saw Dr. Dennis the following week,  reporting headaches that woke him from sleep, and depressed mood. Tr. 486. Dr. Dennis prescribed Celexa.  On November 10, 2011, Dr. Dennis recorded continuing headaches with a GAF of 60. Tr. 584.

On December 6, 2011, Dr. Dennis assessed a GAF of 70.  Tr. 583.  On December 12, Dr. Whinery noted continuing headaches but with a decrease in intensity.  Tr. 586.  Boatwright's short term memory was no better, but no worse.  On December 14, a brain CT scan was normal. Tr. 585.

On December 15, 2011, Beth Klein, Ph.D., completed a Mental Residual Functional Capacity Assessment ("MRFCA"), concluding Boatwright was not disabled. Tr. 516-18.  On January 10, 2012, Karen Schnute M.D., reviewed Boatwright's medical records and  found him not disabled.  Tr. 534.

In March  2013, Grant D. Aaker, M.D., of the Casey Eye Institute, noted daily headaches and a generalized restriction of the left eye visual field.  Tr. 598.  In addition, Yen Tibayan, M.D., diagnosed cardiomyopathy.  Tr.  602.

## II.  The Hearing Testimony

On April 4, 2013, a hearing was conducted before an ALJ in connection with Boatwright's applications.  Tr.  31-66.  Boatwright, his counsel, his ex-wife Tammy Boatwright, and a vocational expert were present.  Tr. 32.

Boatwright testified he was five foot nine and one-half inches tall and about 330 pounds. Tr. 36.  He lived with his aunt and uncle for the past nine months.  Before that he lived in Elk

City, Oklahoma. Tr. 37. He moved here to be closer to family and because his aunt and uncle are helping him. *Id.* He has completed some college. In his last job he was a teacher's aide in a prison school where his job was to protect the teacher from the students. Tr. 38. The job ended when Dr. Whinery told him he could no longer drive or work because another concussion might kill him. Tr. 39. He has not worked since. Tr. 40.

Boatwright has been diagnosed with cardiomyopathy, and gets left-sided chest pain about every other day. Tr. 41. His uncle reminds him to take his medication sometimes. Tr. 42. His blood sugar is controlled by medication, but he ran out two weeks ago and had no money to purchase more. Tr. 43. He has sleep apnea and uses a CPAP machine. He sleeps three to four hours at a time "because my head hurts so bad, I hurt." Tr. 44. Boatwright has peripheral vision loss in his left eye. Tr. 45. About once a day he loses vision in his left eye for 15 to 30 seconds. Tr. 46. He is not allowed to drive. He has a headache "24/7." Tr. 47. Boatwright testified that "some days it's worse than other days but I always have a headache. I mean there are some days it'll bring me down to my knees crying it hurts that bad." *Id.* He gets a shot or morphine every three weeks if he wants it, and a shot of Demerol and something else. *Id.* When he gets the shots he sleeps for three days. Tr. 48. "But then after that I will go back to maybe two to three hours a day of sleep and maybe three but my head will hurt three times as bad as it did before because I'm coming off it and my head hurts." *Id.* Between shots he takes Oxycodone. He has the most intense headache pain once or twice a week. Tr. 49. It lasts about an hour, but varies. Sometimes he lies in a darkened room with a damp cloth on his head. His doctors told him the headaches are related to his brain injuries, and advised him to quit taking Ibuprofen. *Id.* The

headaches started after his last concussion.  Tr. 50.  His headache pain has increased since he quit taking the Ibuprofen about two months ago.

After the August 2010 accident Boatwright noticed he "will lose my temper faster.  I have a short fuse.  I have anger, I'll yell at people, I will scream.  I will throw tantrums.  I don't trust people that much.  I don't, I don't know I mean it's just, it's just changed." Tr. 51.  He believes this caused his divorce.  *Id.*  Boatwright said he had a temper before the accident, but "I had that switch I could turn on and off at will.  But I can't do it now." Tr. 52.  He has wanted to kill himself a couple of times.  A doctor in Oklahoma City wants to examine Boatwright's brain when he dies.

Boatwright said he doesn't pay attention as much since the accident.  Tr. 53.  He continued working until early 2011 but had difficulty in the workplace.  It was hard for him to stay in his chair, he walked around a lot, and was mean to the students. Tr. 54.  He was involuntarily committed to a crisis unit after a suicide attempt.  Tr. 55.  He wants to see a counselor but has no insurance and no money.  *Id.*  He gets confused about directions.  Tr. 57.  He can no longer read a book.  He believes he has Alzheimer's disease or dementia.  He has daily short term memory problems.  "I remember stuff when I was a kid and stuff but I can't remember what I did yesterday or I can't remember what I ate." Tr. 58.

Boatwright has intermittent burning in his left eye.  *Id.*  He gets dizzy when his headaches are bad, once or twice a week.  *Id.*  He lies down when the headaches are bad because he falls down from the dizziness and his left leg gives out.

Page 15 - OPINION AND ORDER

## ALJ FINDINGS

The ALJ applied the sequential disability determination process described above.  At step one, the ALJ found Boatwright has not engaged in substantial gainful activity since the alleged onset date of May 9, 2011.  Tr. 13.

At step two, the ALJ found Boatwright had the severe impairments of traumatic brain injury ("TBI") with dementia, chronic post-concussion syndrome, headaches, cardiomyopathy, obesity, adjustment disorder, anterior ischemic optic neuropathy ("AION"), and optic nerve drusen.  *Id.*

At step three, the ALJ concluded that Boatwright's impairments do not meet or equal the criteria for any condition in the Listing of Impairments, 20 C.F.R. Pt. 404, Subpt. P, App. 1.  Tr. 15.  The ALJ found that Boatwright had the RFC to perform medium work, except he can frequently balance and climb ramps and stairs, and occasionally stoop, kneel, crouch, and crawl.  Boatwright cannot climb ladders, ropes, or scaffolds.  The claimant can perform simple, routine, repetitive tasks with one to two-step instructions.  He is limited to low stress work, which is defined as work requiring few decisions and few changes.  He can have occasional superficial contact with co-workers, regarding trivial matters, but cannot have contact with the public.  Boatwright should avoid even moderate exposure to hazards.  Tr. 16.

At step four, the ALJ concluded Boatwright was unable to perform his past relevant work.  Tr. 23.  However, at step five, the ALJ found jobs exist in significant numbers in the national economy that Boatwright can perform, including scale operator, fruit washer, and electrode cleaner.  Tr. 24.  As a result, the ALJ concluded Boatwright has not been disabled from May 9, 2011, through the date of his decision.  *Id.*

## DISCUSSION

### I. Plaintiff Failed to Preserve His Allegations of Error Regarding Credibility

Boatwright contends the ALJ erred when he found Boatwright less than fully credible, and argues in his Opening Brief that the ALJ erred by finding his activities of daily living inconsistent with his assertion of disability. Plaintiff's Opening Brief, pp. 16-19.

The ALJ identified five reasons to support his credibility finding. Tr. 18-21. The ALJ found: (1) Boatwright's symptoms improved with treatment; (2) examination findings were inconsistent with debilitating symptoms; (3) he embellished his symptoms; (4) he sought minimal treatment for his allegedly disabling symptoms; and (5) Boatwright's daily activities were inconsistent with the limitations he endorsed.

A plaintiff challenging the Commissioner's final decision regarding disability must specifically and directly argue issues in his or her opening brief. *See Carmickle v. Comm'r, Soc. Sec. Admin.,* 533 F.3d 1155, 1161 n. 2 (9th Cir. 2008)(court "ordinarily will not consider matters on appeal that are not specifically and distinctly argued in an appellant's opening brief.")(citation and internal quotations omitted). To the extent Boatwright contends in his reply brief that the ALJ erred in finding that he lacked credibility overall, the Commissioner has not had an opportunity to respond to this argument and for that reason the court deems the argument waived. *See, e.g., Shopp v. Colvin,* 2014 WL 4722524 (D. Or.); *Luttrell v. Comm'r of Soc. Sec.,* 2014 WL 878845 (D. Or).

The ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and for resolving ambiguities. *Andrews v. Shalala,* 53 F.3d 1035, 1039 (9th Cir 1995). However, the ALJ's findings must be supported by specific, cogent reasons. *Reddick v. Chater,*

157 F.3d 715, 722 (9th Cir 1998). Unless there is affirmative evidence showing that the claimant is malingering, the Commissioner's reason for rejecting the claimant's testimony must be "clear and convincing." *Id.* The ALJ must identify what testimony is not credible and what evidence undermines the claimant's complaints. *Id.* The evidence upon which the ALJ relies must be substantial. *Reddick,* 157 F.3d at 724. *See also Holohan v. Massinari,* 246 F.3d 1195, 1208 (9th Cir 2001). General findings (e.g., "record in general" indicates improvement) are an insufficient basis to support an adverse credibility determination. *Reddick* at 722. *See also Holohan,* 246 F.3d at 1208. The ALJ must make a credibility determination with findings sufficiently specific to permit the court to conclude that the ALJ did not arbitrarily discredit the claimant's testimony. *Thomas v. Barnhart,* 278 F.3d 947, 958 (9th Cir 2002).

Regardless of whether the ALJ improperly assessed Boatwright's activities of daily living in his credibility analysis, as argued by Boatwright's counsel, he identified four other unchallenged reasons to find him less than fully credible. The ALJ's determination regarding credibility is thus supported by substantial evidence.

## II. Lay Testimony

The ALJ has a duty to consider lay witness testimony. 20 C.F.R. § 404.1513(d); 404.1545(a)(3); 416.945(a)(3); 416.913(d); *Lewis v. Apfel,* 236 F.3d 503, 511 (9th Cir. 2001). Friends and family members in a position to observe the claimant's symptoms and daily activities are competent to testify regarding the claimant's condition. *Dodrill v. Shalala,* 12 F.3d 915, 918-19 (9th Cir. 1993). The ALJ may not reject such testimony without comment and must give reasons germane to the witness for rejecting her testimony. *Nguyen v. Chater,* 100 F.3d 1462, 1467 (9th Cir. 1996). However, inconsistency with the medical evidence may constitute a

germane reason. *Lewis*, 236 F.3d at 512. The ALJ may also reject lay testimony predicated upon the testimony of a claimant properly found not credible. *Valentine v. Astrue*, 574 F.3d 685, 694 (9th Cir. 2009).

Tammy Lynne Boatwright completed a Third Party Function Report in June 2011. Tr. 177-84. She reported that Boatwright's left eye vision was poor, and that the eye "goes black" once or twice a day for periods of up to four and a half hours. Tr. 177. He has "constant headaches" and "short term memory loss and problems with judgment." *Id.* Mrs. Boatwright said her husband "gets up takes meds, eats breakfast, watches TV, sometimes goes with me to the store, plays video games with the kids, supervises the children when I'm not home." Tr. 178. She noted he helped watch over the children, ages 16, 13, and 8, while she works at night. She said she "help(s) him take care of the kids. They mostly care for themselves but he is here if they have questions...." *Id.* She reported her husband could no longer drive, coach sports, work, make good decisions or remember things he did or said the day before.

Mrs. Boatwright indicated her husband was able to care for his personal needs, but sometimes had to be reminded to care for his hair or change his clothes. Tr. 179. He required reminders to take his medication. He fixed small meals like sandwiches and scrambled eggs about once a day, though it took longer than it used to. He does laundry for three to four hours once or twice a month, with help from his wife and children. He does yard work one or two days about every three weeks with help.

Mrs. Boatwright said it was not safe for him to drive because the vision in his left eye will go bad, he has trouble with depth perception, and headaches made it hard for him to concentrate. Tr. 180. He shops for groceries weekly with his wife or 16 year old daughter. He is not able to

Page 19 - OPINION AND ORDER

pay bills or use a checkbook, and she handles all of the money.   He forgets when he has spent money.  Tr. 181

Mrs. Boatwright stated her husband has problems getting along with others, he gets upset about "little things and acts like everyone is out to get him." Tr. 182.  They argue all the time and she has to "constantly break up argument[s] between him and the children."  *Id.*   It hurts his back to lift over 20 pounds.  Sometimes he has trouble talking, hearing, and seeing.  He is easily confused, does not understand instruction, and gets upset if he thinks you are treating him like he is dumb.  He can walk about one half mile before resting, and can pay attention for five to ten minutes.  He does not finish what he starts.  *Id.*  He "usually gets along OK [with authority figures] at first but then he thinks they are out to get him." Tr. 183.  Stress upsets him, but he can handle small changes.  "He thinks a lot about dying and he is always afraid I don't love him and that I want to leave him."  *Id.*

The ALJ noted the lay witness statements, and said "they are not given significant weight because they are not entirely supported by objective findings and were likely based in large part on the claimant's subjective reports, which are not fully credible for the reasons discussed above." Tr. 22-23.

However, Mrs. Boatwright's observations that Boatwright cannot "make good decisions and remember things he did or said the day before" are not based on Boatwright's subjective reports.  Similarly, her observations that he fails to take care of personal grooming, forgets to take his medications, and is unable to handle money are not based on her husband's subjective reports.  Mrs. Boatwright's statements regarding the claimant's tendency to be upset over little things and to be argumentative with her and their children are based on her own observations.

Her statement that he is easily confused and cannot follow direction are likewise based on personal observation and not on Boatwright's subjective complaints.

In addition, Mrs. Boatwright's observations are supported by the medical record. Drs. Ozolins noted the MMPI, as well as Boatwright's self reports, indicated problems with memory, concentration, anger, and perception in December 2010. Tr. 264-65. Dr. Whinery noted emotional lability in May 2011. Tr. 480. Dr. Dennis noted symptoms of dementia, labile mood, aggression, and impaired judgment and insight in June and July 2011. Tr. 499, 495. Dr. Ahn noted poor judgment. Tr. 415, 490. Clinicians observed severe anger issues and lack of impulse control. Tr. 420-21. In August 2011 Dr. Kahoe recorded mildly impaired attention and concentration skills, with short term memory deficits, and diagnosed dementia due to traumatic head injury with behavioral disturbance. Tr. 445, 448. In October 2011 Dr. Whinery opined that Boatwright was unable to work due to inability to sustain concentration or perform adequate reasoning, with short term memory loss. Tr. 589.

On this record, the ALJ failed to give germane reasons to reject Mrs. Boatwright's observations, and the ALJ's determination on this issue is not supported by substantial evidence. When an ALJ errs by failing to properly discuss competent lay witness testimony favorable to the claimant, a reviewing court cannot consider the error harmless "unless it can confidently conclude that no reasonable ALJ, when fully crediting the testimony, could have reached a different disability determination." *Stout v. Comm'r Soc. Sec. Admin.,* 454 F.3d 1050, 1053 (9th Cir. 2005). Here, the court cannot "confidently conclude" no reasonable ALJ, when fully crediting the testimony, could reach a different disability determination if Mrs. Boatwright's testimony were fully credited.

Page 21 - OPINION AND ORDER

### III. Residual Functional Capacity

Because this matter is remanded, the court need not address the RFC assessment.

## CONCLUSION

For these reasons, the court reverses the decision of the Commissioner and remands this

matter pursuant to sentence four of 42 U.S.C. § 405(g) for further administrative proceedings

consistent with this Opinion and Order.

IT IS SO ORDERED.

DATED this 29th day of October, 2015.

Honorable Paul Papak
United States Magistrate Judge

Page 22 - OPINION AND ORDER